**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **BOBBY COOKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:24-cv-01929-GCS** |
| | ) | |
| **PERCY MYERS** | ) | |
| **and** | ) | |
| **WEXFORD HEALTH SOURCE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM & ORDER**

**SISON, Magistrate Judge:**

## INTRODUCTION AND BACKGROUND

Pending before the Court is Defendant Myers's and Wexford Health Sources, Inc.'s motion for summary judgment. (Doc. 39, 40, 45).[1] Plaintiff opposes the motion. (Doc. 42, 43, 46). Based on the reasons delineated below, the Court **GRANTS** the motion for summary judgment.

Plaintiff Bobby Cooks, an inmate in the custody of the Illinois Department of Corrections and currently incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), brings this action under 42 U.S.C. § 1983. (Doc. 1). In the Complaint, Plaintiff claims Defendants delayed treatment of his torn meniscus, which prolonged his

---

1 Along with the motion for summary judgment, Defendants filed the required Federal Rule of Civil Procedure 56 notice informing Plaintiff of the consequences of failing to respond to the motion for summary judgment and what is required in responding to a motion for summary judgment. (Doc. 41).

pain and necessitated surgery. He asserts Eighth Amendment claims for money damages against Dr. Percy Myers and Wexford Health Source, Inc. ("Wexford").

Plaintiff alleges he was denied adequate medical care for a knee injury he sustained at Pinckneyville while playing basketball on February 20, 2024. For five months, he requested diagnosis and treatment of his injury. He was scheduled for a CT scan soon after he was injured, but he did not undergo diagnostic testing until May 10, 2024. He also did not receive the test results confirming a torn meniscus until sometime after May 29, 2024. In the meantime, Plaintiff was issued medical permits for a low gallery, low bunk, crutches, ace bandages, and ice. (Doc. 1, p. 6-7). Plaintiff complained of "terrible" pain from the date of injury until he was sent to an orthopedic specialist on July 29, 2024. Plaintiff was recommended for surgery following an MRI. He blames Dr. Myers for causing the inordinate delay in diagnosis and treatment of his injury by carrying out Wexford's policy, custom, or practice of delaying necessary treatment to inmates to reduce the overall cost of inmate medical care. He also claims the treatment delay unnecessarily prolonged his pain and exacerbated his injury. *Id.*

On October 22, 2024, the Court conducted a threshold review of Plaintiff's complaint pursuant to 28 U.S.C. § 1915A. Plaintiff was allowed to proceed with an Eighth Amendment deliberate indifference claim against Defendant Myers for denying or delaying Plaintiff's diagnosis and treatment of his knee injury for more than five months from February 20, 2024, to July 29, 2024. (Doc. 9). He was also allowed to pursue an Eighth Amendment claim against Wexford for its policy, custom, or practice of delaying

necessary testing and treatment of inmates, including Plaintiff, in order to reduce the overall cost of inmate medical care at Pinckneyville. *Id.*

Defendant Myers maintains he is entitled to summary judgment as Plaintiff cannot set forth any evidence that he was deliberately indifferent to Plaintiff's serious medical need. Nor did Plaintiff suffer any injury caused by him. Further, Defendants maintain that if the Court grants summary judgment in favor of Defendant Myers, the Court should grant summary judgment in favor of Wexford because a constitutional injury is a predicate to recovery under *Monell*, and Plaintiff has no evidence that Wexford had a policy, custom, or practice of delaying necessary testing and treatment of inmates, including him, in order to reduce the overall costs of inmate medical care at Pinckneyville. Plaintiff counters that the evidence shows Defendant Myers was deliberately indifferent to his serious medical needs. Plaintiff asserts he suffered unnecessary and wanton infliction of pain and suffering due to the delay in treatment, and such pain and suffering could have been avoided had Defendant Myers provided adequate and timely medical treatment. Further, Plaintiff maintains Defendant Myers was known as Dr. Death who knowingly cut costs for Wexford pursuant to a policy, practice or custom. Additionally, Plaintiff argues the Wexford Defendants' recitation of a continually failing, delayed, and inadequate course of medical management only highlights their indifference towards delivering the most basic treatment to Plaintiff.

## UNDISPUTED FACTS[2]

The following facts are taken from the record and presented in the light most favorable to Plaintiff, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

During the relevant times alleged in the complaint, Plaintiff, aged 60, was housed in Pinckneyville. Defendant Percy Myers is a doctor licensed in Illinois. During all relevant times, until September 20, 2024, Defendant Myers worked as a doctor at Pinckneyville.

On February 20, 2024, Plaintiff injured his knee playing basketball. He completed an Individual in Custody Request ("Request") form stating that he thought he tore his ACL and needed to see a doctor.

Plaintiff testified that he does not know what happens to Requests once submitted, that he does not know who reviews them, that he does not know who decides whether he sees a nurse or a nurse practitioner or a doctor, that he does not know who decides which nurse or a nurse practitioner or a doctor, and that he does not know who decides

2 In response to Defendants' motion for summary judgment, Plaintiff did not address/mention any of Defendants' assertions of material facts in violation of Local Rule 56(b)(1). This is despite the fact that Defendants provided Plaintiff with the required notice of the consequences for failing to respond. (Doc. 41). Local Rule 56.(1)(g) also provides: "[a]ll material facts set forth in a Statement of Material Facts or a Statement of Additional Material Facts shall be deemed admitted for the purposes of summary judgment unless specifically disputed." SDIL-LR 56.1(g). Further, Local Rule 56(j) states in part: "[t]his Local Rule applies equally to represented and *pro se* parties. . . ." Thus, the opposing party must respond to the movant's statement of facts. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). As Plaintiff did not respond/dispute Defendants' material facts, the Court deems them admitted for the purposes of this motion for summary judgment.

what date he is seen. He also testified that after seeing a nurse, he does not know who decides whether he sees a nurse practitioner or doctor.

Plaintiff saw a nurse for his complaint of right knee pain on February 21, 2024. He reported that he hurt his knee playing basketball on February 20, 2024, that he had been wrapping and elevating his knee when he was in his cell, that it hurt to walk, and that he was unable to bend his knee. The nurse gave him ibuprofen and referred him to a medical doctor.

On February 22, 2024, Plaintiff saw a nurse for his knee injury. The nurse's plan was to refer Plaintiff to a medical doctor. The nurse gave him ibuprofen and acetaminophen and taught Plaintiff about no weight bearing and elevation.

Plaintiff first saw Defendant Myers for his right knee injury on February 23, 2024. He reported that he injured his right knee three days earlier, that he was in pain, and that he had deceased range of motion. Plaintiff's right knee was swollen and painful on range of motion, with decreased range of motion. Defendant Myers assessed Plaintiff with a knee injury. Defendant Myers prescribed Tylenol 500 mg three times a day for three months; naproxen 375 mg twice a day for three months; referred Plaintiff for a CT scan of his knee; and issued a permit for low bunk, low gallery, ACE wrap, crutches and ice. The permit was effective from February 23, 2024, to June 23, 2024. Defendant Myers also completed a "Medical Special Services Referral and Report" ("Referral") for Plaintiff to be referred for a CT. Wexford authorized the referral on February 29, 2024.

Plaintiff admits Defendant Myers gave him Tylenol, naproxen, and permits for low bunk, low gallery, ACE wrap, crutches, and ice. He also agrees with Defendant

Myer's medical judgment to provide him with those things. Plaintiff knew he had to stay off his leg, keep it elevated, and use crutches.

Plaintiff testified that he does not know what the process is for an inmate to be referred to an outside hospital or provider; that he does not know if Defendant Myers was personally involved in the scheduling of outside referrals, that he does not know who was responsible for such referrals. He also does not know who was responsible for scheduling the CT and does not know the availability of CTs in the Southern District of Illinois.

Plaintiff completed a Request form on March 5, 2024, stating he was in "extreme pain," and that he had not been given an "X-Ray or anything." Three days later, Plaintiff saw a nurse for his knee pain. The nurse noted Plaintiff was using crutches without putting weight on his leg. The nurse referred Plaintiff to a doctor.

Plaintiff next saw Defendant Myers on March 12, 2024. Plaintiff asked about his CT, and Defendant Myers told Plaintiff that it was scheduled. Defendant Myers told Plaintiff to follow-up after the CT.

On April 7, 2024, Plaintiff filed another Request stating that he needed to see a medical doctor about his torn ACL and that he was in extreme pain. The next day, Plaintiff saw a nurse for this complaint. The nurse charted that she saw Plaintiff standing in his cell door and that he had no signs or symptoms of acute pain or distress. The nurse noted she educated Plaintiff on his pending CT and instructed him to continue with his current pain management of over-the-counter pain relief.

On April 10, 2024, Nurse Practitioner ("NP") Bob Blum issued Plaintiff permits for low bunk, low gallery, crutches, ACE wrap, ice, and a medical lay-in, effective from April 10, 2024, to September 1, 2024.

Three days later, Plaintiff completed another Request stating that he needed to see a medical doctor and that he had not been treated for his knee injury. Plaintiff then saw a nurse for his complaint of a torn ACL on April 15, 2024. The nurse referred Plaintiff for knee pain and gave him Tylenol. Plaintiff saw NP Blum again for his knee pain on April 17, 2024. NP Blum's plan was low bunk, low gallery, ice, ACE wrap, and crutches for two months, naproxen 500 mg twice a day for four months, and acetaminophen three times a day for four months. NP Blum also noted that he confirmed with the collegial team that Plaintiff had a CT scan ordered for him.

On April 29, 2024, Plaintiff filed a formal complaint with the Governor of Illinois and the Illinois Department of Professional Regulation regarding his medical treatment.

On May 10, 2024, Plaintiff had the CT of his right knee at Crossroads Community Hospital ("Crossroads"). Plaintiff testified he does not know if he could have had the CT scan sooner and does not know the range of cost for a CT of a knee.

Plaintiff also treated with Defendant Myers on May 10, 2024. Defendant Myers assessed Plaintiff as stable post-CT. At this time, Defendant Myers did not renew Plaintiff's medical lay-in permit due to weight gain and no activity. Defendant Myers referred Plaintiff to an orthopedic surgeon for evaluation. Defendant Myers also issued a permit for waist chains, low bunk, low gallery, ice, crutches and ACE wrap, effective May 10, 2024, to August 10, 2024. Wexford authorized the referral on May 17, 2024.

Plaintiff testified he agrees with Defendant Myers's medical judgment to refer him to an orthopedist. He does not know if Defendant Myers had any personal involvement in scheduling the visit with the orthopedist.

Subsequently, on May 30, 2024, the CT imaging report was faxed to Pinckneyville. The CT findings included "mild-to-moderate lateral tibiofemoral osteoarthritis with moderate reactive joint effusion" and mil osteopenia."

Plaintiff testified he does not know when Pinckneyville received his CT results or when they were reviewed. He also does not know if Defendant Myers had any personal involvement in getting his CT results from the hospital.

Plaintiff had a follow-up with Defendant Myers for his CT results on May 31, 2024. Defendant Myers noted no facture and referred Plaintiff for an MRI. Wexford approved the MRI on June 3, 2024.

Plaintiff agrees with Defendant Myers's medical judgment referring him for an MRI. He also testified that he does not know if Defendant Myers was personally involved in scheduling him for the MRI; that he does not know the availability of MRIs in Southern Illinois, and that he does not know whether a CT or MRI is more or less available than the other.

Plaintiff had an MRI at Crossroads on July 3, 2024. Plaintiff testified that he does not know if he could have had the MRI sooner and that he does not know the cost range for an MRI of the knee. Also on July 3, 2024, Plaintiff saw Physician Assistant ("PA") Ashini Desai. She noted that Plaintiff should follow-up with a medical provider once the MRI results were available.

A week later, Plaintiff submitted a Request stating that he needed to see the nurse about his MRI results. On July 11, 2024, a nurse charted that Plaintiff was not seen at nurse sick call for security reasons. On July 15, 2024, Plaintiff submitted a Request stating that he had not been given the results of the MRI. On July 17, 2024, Plaintiff saw a nurse for his right leg. The nurse documented no signs of obvious discomfort and that Plaintiff refused Tylenol and ibuprofen.

Plaintiff submitted a Request on July 22, 2024, asking about his MRI results. The imaging results of his MRI were faxed to Pinckneyville on July 23, 2024. The MRI findings included a "[d]isplaced flap tear of the anterior horn and body of the lateral meniscus."

Plaintiff does not know when Pinckneyville received his MRI results or when they were reviewed. Similarly, he does not know if Defendant Myers had any personal involvement in getting the MRI results from the hospital.

Treatment for a torn meniscus often begins conservative, depending on the type, size, and location of the tear. Older adults are more often treated conservatively, with an emphasis on non-surgical options if arthritis is present.

On July 23, 2024, Plaintiff saw NP Blum. NP Blum reviewed the MRI results with Plaintiff, answered Plaintiff's question, explained that any corrections/treatment would come from the orthopedist, and that Plaintiff should continue with the crutches. NP Blum issued permits for low bunk, low gallery and crutches, effective July 24, 2024, to February 1, 2025.

Plaintiff consulted with Dr. Peter Mulhern, orthopedic surgeon, on July 29, 2024. Plaintiff does not know what Dr. Mulhern's availability to see patients was in February,

March, April, May, June or July and does not know if Dr. Mulhern could have seen him sooner. Dr. Mulhern agreed with the MRI results that Plaintiff's imaging was consistent with a tear involving the lateral meniscus. He also charted the following: "[e]specially where he has now been limping around with pain in that right knee over the last 5-6 months without much improvement I feel that we need to proceed with an arthroscopy of the right knee and probably partial lateral meniscectomy." Dr. Mulhern told Plaintiff to continue with Naprosyn (naproxen) and Tylenol and that Plaintiff should increase his activity level to get some exercise and decrease the use of crutches.

Plaintiff does not know what treatment Dr. Mulhern would have recommended if he had seen him in March 2024 or April 2024 and that he does not know if he was a surgical candidate in March, April, May or June of 2024.

On August 9, 2024, Plaintiff saw PA Desai for follow-up regarding his consultation with Dr. Mulhern. PA Desai referred Plaintiff for surgery and post-operation follow-up and extended Plaintiff's permit for crutches, ice, ACE wrap, waist chains, low bunk, low bunk gallery, and medical lay-in, effective August 9, 2024, to June 9, 2025.

Defendant Myers's last day at Pinckneyville was September 20, 2024.

Plaintiff saw Dr. Mulhern for a pre-operative examination on September 25, 2024. Thereafter, Plaintiff had arthroscopy of the right knee with partial lateral meniscectomy performed by Dr. Mulhern on October 15, 2024. Plaintiff was in the Pinckneyville infirmary from October 15, 2024, to October 21, 2024. Plaintiff saw Dr. Mulhern for post-operation follow-up on October 30, 2024. Dr. Mulhern did not order another follow-up appointment for Plaintiff. That same day, Plaintiff saw PA Desai for his post-operation

follow-up with Dr. Mulhern. Plaintiff voiced no issues at this time. PA Desai noted a plan for physical therapy evaluation and treatment.

On November 11, 2024, Plaintiff had his physical therapy consultation. Since the consultation, Plaintiff has had physical therapy visits.

Plaintiff has no medical training. Plaintiff testified he is suing Defendant Myers because he thinks that he should have been sent out immediately to see a specialist. Plaintiff has never read any documents describing any Wexford policy, practice or procedure. Plaintiff has never spoken to anyone about Wexford's policies, practices or procedures.

## Legal Standards

### A. Summary Judgment Standard

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 567 (7th Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Fletcher v. Doig,* 145 F.4th 756, 764 (7th Cir. 2025) (citing *Anderson*, 477 U.S. at 255). *See also Bishop v. Air Line Pilots Association International,* 5 F.4th 684, 693 (7th Cir. 2021) (stating that "we are not required to draw

every conceivable inference from the record . . . but 'only those inferences that are reasonable.'") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in factfinding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Smith v. City of Janesville,* 40 F.4th 816, 821 (7th Cir. 2022); *Doxtator v. O'Brien,* 39 F.4th 852, 860 (7th Cir. 2022). In other words, "inferences relying on mere speculation or conjecture will not suffice." *DiPerna v. Chicago School of Professional Psychology,* 893 F.3d 1001, 1006 (7th Cir. 2018) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the

[summary judgment] motion." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal citation omitted).

**B. Deliberate Indifference**

The Eighth Amendment prohibits cruel and unusual punishments, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457-458 (7th Cir. 2020) (citations omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"— not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (citation omitted).

To prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (citations omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Johnson*, 5 F.4th at 824. *Accord Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025) (citations omitted). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019) (citations omitted). It is not necessary for such a medical condition to "be life-threatening to be serious; rather,

it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm") (internal quotation marks omitted).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Johnson*, 5 F.4th at 824. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) (citations omitted). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Lockett*, 937 F.3d at 1023. *See also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) (stating that "isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Eagan v. Dempsey*, 987 F.3d 667, 688 (7th Cir. 2021) (citations omitted). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (citations omitted). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

## DISCUSSION

### A. Defendant Myers

For the purposes of this motion and based on the record before the Court, the Court finds that the injury to Plaintiff's right knee injury constitutes an objectively serious medical need. However, based on that same record and construing the evidence in the light most favorable to Plaintiff, the Court finds there is no evidence in the record to show that Defendant Myers was deliberately indifferent to Plaintiff's serious medical need regarding his knee injury.

The record reveals that Defendant Myers provided appropriate and continued medical treatment to Plaintiff for his right knee injury. Over the course of three months, Plaintiff saw Defendant Myers four times. From Defendant Myers, Plaintiff received the

following regarding his right knee injury:

- Tylenol 500 mg 3 times a day for three months and naproxen 375 mg twice a day on February 23, 2024.
- Referral for Plaintiff for a CT scan on February 23, 2024.
- 3-month permit for low bunk, low gallery, ACE wrap, crutches and ice on February 23, 2024.
- Notification to Plaintiff that his CT was scheduled on March 12, 2024.
- Assessment that Plaintiff was stable post-CT on May 10, 2024.
- Permit for waist chains, low bunk, low gallery, ice, crutches and ACE wrap on May 10, 2024.
- Referral for Plaintiff to be referred to orthopedic surgeon for evaluation on May 10, 2024.
- Notation that Plaintiff's CT showed no fracture on May 31, 2024; and
- Referral for Plaintiff for an MRI on May 31, 2024.

Thus, the record demonstrates Defendant Myers referred Plaintiff for a CT, referred Plaintiff to an orthopedic surgeon, and referred Plaintiff for an MRI within a three-month period. The record also reveals Defendant Myers prescribed Plaintiff various pain medications and provided him with permits to address Plaintiff's pain issues. There is no evidence in the record to suggest that the treatment Plaintiff received from Defendant was "so blatantly inappropriate as to evidence intentional mistreatment." *Greeno v. Daly*, 414 F.3d 645, 654 (7th Cir. 2005) (citation omitted). Although Defendant Myers *initially* did not provide Plaintiff with the MRI, which is the specific treatment Plaintiff sought, that is insufficient to permit a reasonable jury to find deliberate indifference. *See, e.g.*, *Snipes*, 95 F.3d at 592. (stating that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim."). Defendant Myers eventually did refer Plaintiff for an MRI and Plaintiff did receive his knee surgery from an outside orthopedic surgeon. Even construing the evidence in the light most favorable to Plaintiff, the Court finds that no

reasonable jury could conclude that Defendant Myers was deliberately indifferent to Plaintiff's serious medical needs regarding his knee injury.

**B. Defendant Wexford**

Lastly, the Court addresses Plaintiff's *Monell* claim against Wexford, which seeks to hold Wexford liable for violation of his Eighth Amendment rights. As a private corporation, Wexford may be liable under § 1983 only if the execution of one of its policies or customs inflicts the constitutional injury Plaintiff asserts. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

Defendants maintain that if the Court grants summary judgment for Defendant Myers, the Court should grant summary judgment in favor of Wexford because a constitutional injury is a predicate to recovery under *Monell*. Further, Defendants maintain that Plaintiff has presented no evidence that Wexford had a policy, custom or practice of delaying necessary testing and treatment of inmates, including him, to reduce the overall cost of inmate medical care at Pinckneyville. Plaintiff counters that Wexford established an overall policy and custom to suit its own financial bottom line than afford proper medical care to its patients. The Court agrees with Defendants.

Here, Plaintiff cannot sustain a *Monell* claim against Wexford because he has not provided evidence that would permit a jury to find an underlying constitutional violation. *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). But even if the contrary were true, Plaintiff's *Monell* claim fails because he has not offered evidence that would permit a jury to find that the policy

he claims actually existed or that the claimed policy is connected to the denial of his requested medical treatments. Plaintiff contends that Wexford has a policy or practice of delaying or denying medical treatment in order to reduce costs.[3] (Doc. 42, p. 23). But he has cited no evidence of this cost-cutting policy other than his own experience, a vague statement about other inmates not getting proper care because of the cost cutting policy and a vague statement about a former nameless nurse who may have information about the cost cutting policy. *Id.* at p. 2, 23. This is insufficient to permit a reasonable jury to find that Wexford actually had a widespread practice of refusing or denying necessary medical care for cost-cutting reasons. *See, e.g.*, *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (stating that "[o]ne broad, vague statement about an occurrence affecting other inmates in a detention facility does not support the inference of a 'widespread' custom."); *Montague v. Wexford Health Sources, Inc.*, No. 14-3070, 615 Fed. Appx. 378, 379 (7th Cir. Sept. 25, 2015) (holding opinion of plaintiff and other inmates insufficient to establish policy of purposeful delay of medical treatment). Thus, the Court finds that Plaintiff has not presented evidence from which a reasonable jury could conclude that Wexford had a cost-cutting policy that was the "moving force" behind his allegedly inadequate medical treatment. Wexford is thus entitled to summary judgment.

---

3 In his affidavit, Plaintiff states "Dr. Myers known here as Dr. Death has knowingly [sic] cost cut for Wexford pursuant to a policy, practice and custom that is Wexford. He has been known to say he get [sic] Bonuses from Wexford to keep the cost down and that he did." (Doc. 42, p. 23).

## CONCLUSION

Accordingly, the Court **GRANTS** the motion for summary judgment (Doc. 39). The Court **FINDS** in favor of Defendant Percy Myers and against Bobby Cooks on Count 1 of the Complaint and in favor of Defendant Wexford Health Source, Inc., and against Bobby Cooks on Count 2 of the Complaint. Further, the Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same and close the case.

**IT IS SO ORDERED**.

**DATED: August 31, 2026.**

Gilbert C. Sison

Digitally signed by Judge Sison
Date: 2026.08.31 13:15:42 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**